**COTTON GINNY, LIMITED, a Canadian corporation, Plaintiff,**

v.

**COTTON GIN, INC. and Cotton Gin Kids, Inc., Defendants.**

**No. 86–2399–CIV.**

United States District Court, S.D. Florida.

Jan. 28, 1988.

Harley S. Tropin, Miami, Fla., for plaintiff.

Allen P. Reed, P.A., Miami, Fla., for defendants.

ORDER

MARCUS, District Judge.

THIS CAUSE has come before the Court pursuant to cross-motions for summary judgment brought by the Plaintiff, Cotton Ginny, Ltd. ("Cotton Ginny") and the Defendants, Cotton Gin, Inc., and Cotton Gin Kids, Inc. (collectively "Cotton Gin"). Plaintiff contends that the Defendants' unauthorized use of the mark "Cotton Gin" and imitation of Cotton Ginny trade dress constitute violations of sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1125(a) (1982), as well as § 495.151 of the Florida Statutes and common law rights. Defendants have counterclaimed asserting that Plaintiff has infringed their rights under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as well as state, Fla.Sta.Ann. § 495.151 (West 1972), and common law. The motions for summary judgment are addressed only to the issue of liability for trademark infringement. The parties agree that "Cotton Gin" is confusingly similar to "Cotton Ginny." Because we find that there are genuine issues of material fact as to a number of issues in this matter, the motions for summary judgment must be denied.

In sum, summary judgment is inappropriate in this case because Plaintiff has failed to demonstrate that Broward, Palm Beach and Dade Counties represent a single market in which their trademark was appropriated and used. Moreover, a question of material fact remains as to whether Dade County was an area of natural expansion for the Plaintiff at the time Mikron marketed their product. Further, there are questions of material fact as to the acquisition of secondary meaning of the Plaintiff's trademark during that period. Finally, Defendants are not entitled to summary judgment as they failed to establish the defense of abandonment.

Plaintiff is a Canadian corporation which has, since 1979, been engaged in the design, manufacture and distribution of cotton sportswear which is identified by the mark "Cotton Ginny." Originally, the Cot-

ton Ginny retail outlets operated only in Canada. Subsequently, the corporation expanded its operations into the United States. In October 1981, a former Cotton Ginny employee, Rhonda Gianacce, opened a retail outlet in Pompano Beach, Broward County, Florida, which sold the Cotton Ginny product. Gianacce and her husband, Michael Gianacce, were the sole owners of Mikron, Inc. ("Mikron"). Cotton Ginny and Mikron entered into an agreement on June 25, 1981 which provided, *inter alia*,

> WHEREAS Cotton [Ginny] is the owner of the trade mark and trade name Cotton Ginny and the good will associated therewith and under which name Cotton [Ginny] has sportswear manufactured for it for distribution to its own and other retail stores.
>
> AND WHEREAS it is the desire of the parties hereto that the retailer [Mikron] acquire the exclusive right to operate retail stores in Palm Beach County in the State of Florida, hereinafter referred to as the territory, under the name of Cotton Ginny and to sell sportswear under that name supplied to it by Cotton [Ginny].
>
> NOW THEREFORE in consideration of the mutual premises [sic] and covenants herein contained, the parties hereto agree as follows:
>
> 1. Cotton [Ginny] hereby agrees to give the retailer exclusive right and licence to operate retail stores in the territory under the name of Cotton Ginny.
>
> 2. Cotton [Ginny] agrees to sell to the retailer and only to the retailer in the territory any merchandise presently or from time time [sic] sold by Cotton [Ginny] under the label Cotton Ginny.

[Memorandum in Support of Plaintiff's Motion for Summary Judgment and In Opposition to Defendants' Summary Judgment Motion, Exhibit A]. Mikron then registered "Cotton Ginny" under the Florida fictitious name statute in November 1981. Fla.Sta.Ann. § 865.09 (West 1976). Pursuant to the terms of this Agreement, Mikron paid $13,000 in licensing fees to Cotton Ginny and purchased from it goods valued at over $100,000. [Gianacce Affidavit at ¶ 5]. Cotton Ginny executives inspected the Pompano Beach store on several occasions. [*Id.* at ¶ 6].

In June of 1982, Defendants opened their store in Miami, Dade County, Florida, selling cotton sportswear. Cotton Gin, Inc., was incorporated in Florida on June 23, 1983. The Defendants' store has operated continuously since June 1982. Cotton Gin Kids, Inc. was incorporated on June 20, 1986.

The Cotton Ginny outlet in Pompano Beach closed in January 1984, when Rhonda Gianacce returned to live in Canada. Upon the closing of this store, Cotton Ginny was without an outlet in Florida. Apparently, sometime in 1985 or 1986, Cotton Ginny began to own and operate retail stores in the United States and eventually opened a store in Dade County in December 1986. Further, Cotton Ginny obtained federal registrations for their service mark (No. 1,333,796) and trademark (No. 1,380,-842) on April 30, 1985 and April 27, 1986 respectively. The question before the Court on these motions for summary judgment is which party has superior rights to the mark.

The standard to be applied in reviewing a summary judgment motion is stated unambiguously in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

It may be entered only where there is *no* genuine issue of material fact. Moreover, the moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In applying this standard, the Eleventh Circuit has explained:

> In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to

the party opposing the motion. *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608; [*Environmental Defense Fund v.*] *Marsh*, 651 F.2d [983] at 991. All reasonable doubts about the facts should be resolved in favor of the non-movant. *Casey Enterprises v. Am. Hardware Mutual Ins. Co.*, 655 F.2d 598, 602 (5th Cir.1981). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Marsh*, 651 F.2d at 991; *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co.*, 420 F.2d at 1213. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Electronics [Techniques, Inc. v. Wackenhut]*, 669 F.2d [1026] at 1031; *Croley v. Matson Navigation Co.*, 434 F.2d 73, 75 (5th Cir.1970).

Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. at 160, 90 S.Ct. at 1609–10; *Marsh*, 651 F.2d at 991. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611–12 (5th Cir.1967). *See Dalke v. Upjohn Co.*, 555 F.2d 245, 248–49 (9th Cir.1977).

*Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1368–69 (11th Cir.1982); *see also Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502 (11th Cir.1985), *cert. denied*, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986).

The United States Supreme Court has recently provided significant additional guidance as to the evidentiary standard which trial courts should apply in ruling on a motion for summary judgment:

> [The summary judgment] standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Brady v. Southern R. Co.*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Court in *Anderson* further stated that "[t]he mere existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* 106 S.Ct. at 2512. In determining whether this evidentiary threshold has been met, the trial court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Id.* at 2513. If the non-movant in a summary judgment action fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted. *Id.*

In another recent case, the Supreme Court has declared that a non-moving party's failure to prove an essential element of a claim renders all factual disputes as to that claim immaterial and requires the granting of summary judgment:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will *bear* the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of

law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (emphasis added). Considering the present motions under this standard, we must conclude that summary judgment in favor of either party is inappropriate.

 It is axiomatic that a trademark[1] is acquired through appropriation and use. *See, e.g., United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918); *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916); *Shelia's Shine Products, Inc. v. Shelia Shine, Inc.*, 486 F.2d 114, 122 (5th Cir.1973); *Selchow & Righter Co. v. Goldex Corp.*, 612 F.Supp. 19, 24 (S.D.Fla.1985); 3 Callman, *The Law of Unfair Competition, Trademarks and Monopolies*, § 19.01 (4th ed. 1983). The mark need not be registered under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, in order to be protected against infringement. The appropriation and use of the mark itself establishes one's exclusive right to its utilization. *See Pedi–Care, Inc. v. Pedi–A–Care Nursing, Inc.*, 656 F.Supp. 449 (D.N.J. 1987). However, the "rights to a mark . . . accrue from prior use . . . to the one who first uses the marks in connection with a particular line of business." *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 819 (1st Cir.1987) (citations omitted). The fact that Cotton Ginny eventually registered its mark does not expand its rights and entitle it to exclusive use if it did not establish priority of use. *See Terry v. International Dairy Queen, Inc.*, 554 F.Supp. 1088, 1096 (N.D.Ind.1983) (*citing Faciane v. Starner*, 230 F.2d 732 (5th Cir. 1956)).

"An essential element of a claim of trademark infringement is a likelihood of confusion among prospective purchasers of plaintiff's products and services caused by defendant's use of plaintiff's marks." *Wheeler*, 814 F.2d at 816 (citation omitted). In the present case, the parties have agreed that the similarity in names is confusing to customers and prospective customers. [Status Report, Section III]. Accordingly, we are left, on these motions, only to resolve whether there exists an issue of material fact as to which party first acquired the trademark through its use.

 The basic facts of this case are undisputed. Cotton Ginny began using its mark in Canada in 1979. Obviously, their use predates the use by Defendants. However, a trademark is acquired only within those markets where the mark has been used and its meaning become known. *Hanover Star Milling Co.*, 240 U.S. at 415–16, 36 S.Ct. at 361; *see also Spartan Food Systems, Inc. v. HFS Corp.*, 813 F.2d 1279, 1282–84 (4th Cir.1987). Since the Cotton Ginny goods were not sold in Florida prior to 1981, there can be no claim that the Plaintiff had established a protectable mark anywhere in Florida until the licensing agreement with Mikron became operative in 1981.

Plaintiff's claim to prior use in South Florida is based solely on its licensing agreement with Mikron. "A trademark owner may extend the territory in which he has the right to exclusive use of his trademark, either by expanding his own operations, or he may introduce his trademark and create a demand for his variety of goods in new territory, by licenses subject to his control." *Denison Mattress Factory v. Spring–Air Co.*, 308 F.2d 403, 409 (5th Cir.1962) (citations omitted). *See also Turner v. HMH Publishing Co.*, 380 F.2d 224, 229 (5th Cir.), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967); *Jordan K. Rand, Ltd. v. Lazoff Bros., Inc.*, 537 F.Supp. 587, 593 (D.P.R.1982); *Pneutek, Inc. v. Scherr*, 211 U.S.P.Q. (BNA)

---

1. "The term 'trade-mark' includes any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify and distinguish his goods, including a unique product from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127 (1982 & Supp. II 1984).

824, 833 (T.T.A.B.1981). Plaintiff maintains that its use in Canada and elsewhere of "Cotton Ginny" established their ownership of the trademark, and that the use of the term in conjunction with the sale of products by Mikron in Florida inured to the benefit of Cotton Ginny.

In order for the licensor to take advantage of the licensee's use of the mark, the licensor must take "reasonable measures to detect and prevent misleading uses of [the] trademark. . . ." *Jordan K. Rand, Ltd.,* 537 F.Supp. at 592 (citations omitted). The licensor must police and inspect the licensee's operation to guarantee the quality of the product introduced to the public. *Pneutek, Inc.,* 211 U.S.P.Q. at 833 (*citing The National Lampoon, Inc. v. American Broadcasting Companies, Inc.,* 376 F.Supp 733, 182 U.S.P.Q. (BNA) 24, 26 (S.D.N.Y.), *aff'd,* 497 F.2d 1343, 182 U.S. P.Q. (BNA) 6 (2d Cir.1974) (per curiam)); *see also General Motors Corp. v. Gibson Chemical & Oil Corp.,* 786 F.2d 105 (2d Cir.1986); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368 (5th Cir.1977). Here, the adequacy of Plaintiff's control over Mikron's operation is apparent. Cotton Ginny sold Mikron goods manufactured by the Plaintiff under their quality control procedures. Moreover, representatives of Cotton Ginny visited the Pompano Beach store and inspected the operation. Defendants have not submitted any evidence which controverts the satisfactory nature of this control. *See Celotex Corp.,* 106 S.Ct. at 2552–53. Under these facts the use by Mikron of the mark "Cotton Ginny," must be viewed as having inured to the benefit of the Plaintiff and established their use of the mark in Broward County during 1981.

Thus, when Cotton Gin began began their operation in Dade County in June 1982, Cotton Ginny had already used the mark in Broward County. However, as discussed *infra,* Defendants dispute the claim that "Cotton Ginny" was a protectable trademark at that time because the term had not acquired secondary meaning in the relevant market. Questions exist as to the extent of the sales market in which

Mikron actually used the Cotton Ginny mark. Under *Hanover Star Milling Co., supra,* and *United Drug Co., supra,* "common law [trademark] rights are restricted to the locality where the mark is used and to the area of probable expansion." *Spartan Food Systems, Inc.,* 813 F.2d at 1282. Application of this rule here presents a threefold problem: first, whether given the evidence submitted pursuant to these motions for summary judgment, there exists an issue of material fact as to the parameters of the locality in which Cotton Ginny used the mark and its area of probable expansion; second, whether a licensee may expand the territory in which a trademark is used and protected; and third, whether a licensee, whose operation under the specific terms of the licensing agreement is confined to a specific territory, may expand the use and protection of the trademark outside that territory. We conclude that while the marketing activity of a licensee may expand the territory in which the mark is used beyond that identified in the written agreement, the evidence extant is insufficient for purposes of the present motions to determine the size of the market in which the Cotton Ginny mark was actually used.

The determination of whether Broward and Dade counties represent a single market or distinct markets is of fundamental importance to the disposition of this case. The Fourth Circuit Court of Appeals has recently considered the criteria relevant to the measurement of the geographic market in which the mark is protected. *Id.* at 1282–84. There, the court noted that the area of probable expansion may be measured by examining either the owner of the trademark's "zone of natural expansion," *id.* at 1283 (*citing Weiner King Inc. v. Wiener King Corp.,* 615 F.2d 512, 523 (C.C. P.A.1980)), or the mark's potential for "market penetration." *Id.* (*citing Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1398–99 (3d Cir.), *cert. denied,* 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985)). In applying these tests to the present case, we must determine whether the conduct of both the Plaintiff and the licensee may be con-

sidered. Of course, the activities of the Plaintiff, as owner of the mark, are of vital importance in establishing the relevant geographic market. However, the question remains as to whether the licensee may expand, as well as establish, the area in which a mark is protected.

■■■ Initially, we note that while the use by a licensee may inure to the benefit of the owner for purposes of establishing the mark, the licensee, itself, retains no independent right in the mark. *Jordan K. Rand, Ltd.*, 537 F.Supp. at 593; *Kappa Sigma Fraternity v. Kappa Sigma Gamma Fraternity*, 654 F.Supp. 1095, 1100 (D.N.H 1987). The conduct of a licensee is effective in establishing the appropriation and use of a mark because an effectively supervised licensee may establish the perception by consumers in the relationship between the quality of the product and its identifying mark. Therefore, so long as the relationship between the parties fully maintains the quality of the product, then the logical extension of that theory is that a licensee, through sales, advertising, or other marketing activity may expand, geographically, the recognition of the licensor's mark. The success of this relationship could expand the reputation of the product beyond that originally contemplated by the parties to the licensing agreement. Since the licensee has no proprietary interest in the mark, its success in marketing the product obviously cannot create an ownership interest in the mark, in favor of the licensee, outside of the "licensing territory." Further, the recognition and association of the trademark with the product in a wide geographic area cannot be without any effect on the mark. Accordingly, the expanded influence of a trademark created by the efforts of the licensee must inure to the benefit of the licensor.

This conclusion does not resolve the question before us, however. The Agreement between Plaintiff and Mikron gave Mikron the "exclusive right to operate stores in Palm Beach County." Whether that restriction limited, in any way, the licensee's ability to establish prior use of the mark in Dade County, the site of the Cotton Gin store, now becomes the focus of our inquiry. At this step in the analysis, we consider whether the Plaintiff, pursuant to the licensing agreement maintained sufficient control over Mikron outside of Palm Beach County so as to insure the quality of the product, and whether the agreement actually relinquished their exclusive rights to "Cotton Ginny" outside of that county. *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1517 (11th Cir.1984) (when mark holder relinquishes exclusive rights to a single user, that is appropriately classified as a license). The Plaintiff's uncontroverted evidence established the sufficiency of the quality control over Mikron. The facts that must be considered in determining whether Cotton Ginny relinquished its exclusive rights to the mark outside of Palm Beach County dovetail with those that must be considered in the context of the geographic boundaries of the ownership rights—that is, whether the relationship between Cotton Ginny and Mikron actually created a licensing arrangement for a geographic area which is larger than Palm Beach County.

The facts relevant to this inquiry are these: First, Pompano Beach is located in Broward, not Palm Beach County. Second, Mikron advertised its product in Dade County, and customers from that area did travel to Pompano Beach to buy the Plaintiff's product. By establishing a store, outside the territory explicitly established in the licensing agreement, Plaintiff's acquiesced in the use of their mark by Mikron in an area larger than that specifically identified in the licensing agreement. Accordingly, the effect of the licensee's conduct may not be limited to merely establishing use of the trademark in Broward or Palm Beach counties. Mikron's activities must be be considered in conjunction with the conduct of the Plaintiff in determining whether Dade County was in the Plaintiff's area of probable expansion during 1981–1984.

■■■ The Fourth Circuit in *Spartan Food Systems, Inc., supra*, outlined the

standards that have been applied in determining the scope of geographic expansion.

Courts that follow the "zone of natural expansion" theory have applied the following five-part test: "the party's (1) previous business activity; (2) previous expansion or lack thereof; (3) dominance of contiguous areas; (4) presently-planned expansion; and, where applicable (5) possible market penetration by means of products brought in from other areas."

*Id.* at 1283 (citations omitted). Under the "market penetration" theory, courts have considered:

"(1) the volume of sales of the trademarked product; (2) the growth trends ... in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area." *Natural Footwear,* 760 F.2d at 1398–99.

*Id.* Applying these standards we find that there are issues of material fact as to whether the conduct of Cotton Ginny and Mikron established that Dade County is part of the "zone of natural expansion" or area of "market penetration" for the "Cotton Ginny" trademark.

Based upon the evidence submitted, the only business activity by the Plaintiff or Mikron in Dade County prior to June 1982 was the advertising and other marketing activities by Mikron. However, "[a]dvertising alone cannot establish common law rights." *Id.* at 1283 (*citing Wrist–Rocket Manufacturing Co. v. Saunders Archery Co.,* 578 F.2d 727, 732 (8th Cir.1978)). Also, Mikron experienced no expansion, although the affidavit of Gianacce indicates that expansion was contemplated. Cotton Ginny, itself, had experienced expansion only in Canada at that time. Moreover, the record does not suggest that during the period of operation either Mikron or Cotton Ginny exerted dominance over the contiguous area of Broward and Dade Counties. The evidence submitted by the Plaintiff does not definitively demonstrate that Dade County was within Cotton Ginny's zone of natural expansion. In fact, the

evidence does not necessarily indicate that during the relevant period Cotton Ginny intended expansion beyond this one store in Pompano Beach.

The market penetration theory also does not support Plaintiff's contention that its product had become associated with its mark in Dade County. Plaintiff has not established the volume of sales, growth trends, or the amount of product advertising in the area. Plaintiff does submit that 30% of Mikron's customers were from Dade County. However, this assertion, by itself, does not meet the requirements for "market penetration."

■ Evidence which demonstrates Dade and Broward counties comprise one sales market may tend to establish Plaintiff's claim of prior use. Should Plaintiff establish this proposition, then the sales outlet in Pompano Beach may be viewed as establishing the use of the Cotton Ginny mark in the Dade/Broward market. However, such conclusive evidence has not been submitted. Therefore, considering that these counties may in fact constitute distinct markets, the record evidence is insufficient to sustain a finding that, as a matter of law, Dade County was part of Cotton Ginny's area of probable expansion prior to the Defendants' use of the mark in Dade County. If Defendants' use of the mark in Dade County represents prior use in a remote market then even the subsequent registration of the mark by Cotton Ginny could not divest Cotton Gin of the right to use the mark in Dade County. *See Weiner King, Inc.,* 615 F.2d at 522.

■ An additional reason suggests that summary judgment would be inappropriate here. Defendants contend that the Plaintiff's use of the mark failed to establish secondary meaning and therefore did not create a priority of use in favor of Cotton Ginny. Where the product name chosen "emphasizes the qualities of an article—a descriptive mark ... [t]hese ... are initially invalid and unregistrable trademarks." 3 Callman *The Law of Unfair Competition, Trademarks and Monopolies,* § 19.25 at 78. Such names must acquire "secondary meaning" in order to be reg-

istered or otherwise protected under the common law. *American Television and Communications Corp. v. American Communications and Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir.1987).

> "In order to establish secondary meaning the plaintiff must show that the primary significance of the term in the minds of the consumer public is not the product but the producer." [*The Vision Center v. Opticks, Inc.*, 596 F.2d 111, 118 (5th Cir.1979)], *quoting Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938). If the corporate name denotes to the consumer or purchaser "a single thing coming from a single source," then it has acquired secondary meaning. *American Heritage Life Insurance Co. v. Heritage Life Insurance Co.*, 494 F.2d 3, 12 (5th Cir. 1974). The answer depends upon (1) the length and manner of its use; (2) the nature and extent of advertising, promotion and sales; (3) the plaintiff's efforts to promote a conscious connection in the public's mind between the name and the plaintiff's product or business; and (4) the extent to which the public actually identifies the name with the plaintiff's product or venture. *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513 (11th Cir.1984).

*Id.*

■ The acquisition of secondary meaning in this case is relevant only if "Cotton Ginny" is considered a descriptive term. "A descriptive term identifies a characteristic or quality of an article or service, and may become a protectable trade name only if it acquires secondary meaning." *Id.* at 1548. If "Cotton Ginny" were determined to be a suggestive term which "suggests, rather than describes, a characteristic of the goods ... and requires an effort of the imagination by the consumer in order to be understood as descriptive," *Id.* at 1549, then secondary meaning need not be established in order for the mark to be protected. Here, we must conclude that the term

"Cotton Ginny" is a descriptive term. Certainly, "Cotton" describes a quality of the goods—that is, they are made out of cotton—and standing alone would be a generic term.[2] On the other hand, "Ginny," itself, is merely suggestive. The words used together must be considered a descriptive term, as they readily identify a characteristic of the product.

■ Defendants maintain that since Plaintiff's trade name had not established secondary meaning when utilized prior to June 1982, then its use cannot be viewed as prior to Defendants' so as to oust their common law rights in Dade County. *See A.J. Canfield Co. v. Concord Beverage Co.*, 629 F.Supp. 200, 210 (E.D.Pa.1985) ("Secondary meaning cannot exist in a market that plaintiff has not penetrated, by the time the defendant begins its use of the mark in question."), *aff'd sub nom, A.J. Canfield Co. v. Honickman*, 808 F.2d 291 (3d Cir.1986). The "Cotton Ginny" mark may have acquired secondary meaning by the time of its reintroduction into Florida. However, "[t]he existence of secondary meaning is a question of fact," *American Television and Communications Corp.*, 810 F.2d at 1549 (citations omitted), and this record contains no evidence that "Cotton Ginny" acquired secondary meaning while being used by Mikron.

■ Finally, the Defendants assert that they are entitled to summary judgment because they claim that, assuming *arguendo* the Plaintiff established the trade mark "Cotton Ginny" in South Florida during the period of 1981 through January 1984, it abandoned any rights it may have acquired because it did not reintroduce the mark into the market until two and one-half years later. By the time of reintroduction, Defendants had been using the name "Cotton Gin" for over four years. In support of this contention, Cotton Gin cites 15 U.S.C. § 1127(a) (1982 & Supp. II 1984) which states, *inter alia*,

> A mark shall be deemed to be "abandoned"—

---

2. "A generic name suggests the basic nature of the article or service. Most courts hold that a generic term is incapable of achieving trade name protection.... An arbitrary or fanciful name bears no relationship to the product or

service and is ... protectable without proof of secondary meaning." *American Television and Communications Corp.*, 810 F.2d at 1548, 1549 (citation omitted).

(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

In order to utilize the abandonment defense, Defendants must demonstrate *both* non-use of the trademark and an intent to abandon it. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 138–39 (3d Cir.1981) (*cited with approval in Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1545 (11th Cir.1984)). Moreover, "abandonment, being in the nature of a forfeiture must be strictly proved." *Id.* at 139 (citation omitted).

■ In the present case, Defendants have failed to establish either of the prerequisites for a defense of abandonment. Cotton Gin has asserted that Plaintiff did not use the mark in Florida during a two and one-half year period. However, "[c]onsistent and proper use of those marks elsewhere in the United States defeats any claim of non-use." *Id.* (citations omitted). While the record evidence does not establish the nature in which the mark was used during that period, the mere assertion that it was not used in Florida during that period cannot establish the "no-use" prong of the abandonment defense. Therefore, upon this record, Defendants have not made out a *prima facie* claim of abandonment.

Further, Defendants have submitted no evidence which would tend to prove that the Plaintiff intended to abandon the mark. The mere fact that Cotton Ginny had no outlet in Florida for a period of approximately two and one-half years does not indicate an intent to abandon. "If the proponent of a mark stops using it but demonstrates an intent to keep the mark alive for use in resumed business, the mark retains 'residual' goodwill and thus continues to enjoy trademark protection, as long as it retains its significance as an indication of the origin of the goods or services." *Pan American World Airways, Inc. v. Panamerican School of Travel, Inc.*, 648 F.Supp. 1026, 1031 (S.D.N.Y.) (citation omitted), *aff'd*, 810 F.2d 1160 (2d Cir.1986); *see also Miller Brewing Co. v. Oland's Breweries [1971] Ltd.*, 548 F.2d 349, 351–52 (C.C.P.A.

1976) ("abandonment does not result from a mere temporary withdrawal from the market caused by outside causes.") (*citing Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 31, 21 S.Ct. 7, 11, 45 L.Ed. 60 (1900)); *cf., Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 101–02 (5th Cir. 1983). For the purposes of the instant summary judgment motions, the claim of abandonment cannot form the basis for Defendants' right to use the mark "Cotton Gin."

Because we have found that there exist questions of material fact necessary for the resolution of this matter, it is

ORDERED AND ADJUDGED that Plaintiff's Motion for Summary Judgment is hereby DENIED. It is further

ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment is hereby DENIED.